UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------- X

SHAWN GILLIAM, SR.; and SHAWN GILLIAM,
JR.

                               Plaintiffs,

              -against-

THE CITY OF NEW YORK; SGT. WILLIAM
LARKIN, TAX # 930534; P.O. ELISHA THOMAS,
TAX # 937623, P.O. TAWAINA O'NEAL-DAVIS,
TAX # 906979; P.O. CHRISTOPHER BROOKS,
SHIELD # 30086, TAX # 934534; P.O. ROLAND
MATTHEWS, TAX # 937048; P.O. OLEG MATAT,
TAX # 937042; P.O. PETER DEVITA, TAX #
934753; and P.O. JOHN DOES # 1-5, the
individual defendant(s) sued individually
and in their official capacities,

                             Defendants.

---------------------------------------- X

**SECOND AMENDED**
**COMPLAINT**

12-cv-3348-NG-CLP

ECF Case

Jury Trial Demanded

## PRELIMINARY STATEMENT

     1.    This is a civil rights action in which plaintiffs

seek relief for the violation of plaintiffs' rights secured by

42 U.S.C. § 1983; and the First, Fourth, Fifth, Sixth, and

Fourteenth Amendments to the United States Constitution, and the

laws of the State of New York.  Plaintiffs' claims arise from

incidents that arose on or about April 8, 2011 and June 7, 2011.

During the incident, the City of New York, and members of the

New York City Police Department ("NYPD") subjected plaintiffs

to, among other things, excessive force, assault and battery,

unlawful search and seizure, false arrest, denial of medical care, retaliation for free speech, fabricated evidence, denial of a fair trial, negligence, intentional and negligent infliction of emotional distress, negligent hiring and retention, supervision, training and instruction of incompetent and unfit employees, and implementation and continuation of an unlawful municipal policy, practice, and custom.  Plaintiffs seek compensatory and punitive damages, declaratory relief, an award of costs and attorney's fees, pursuant 42 U.S.C. §§ 1988, and such other and further relief as the Court deems just and proper.

## JURISDICTION & VENUE

2.    This action is brought pursuant to 42 U.S.C. § 1983, and the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.  Jurisdiction is conferred upon this Court by the aforesaid statutes and 28 U.S.C. §§ 1331 and 1343.

3.    Plaintiffs invoke the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear and decide claims arising under state law.  Plaintiffs' notice of claim were duly filed on defendant City of New York within 90 days of the incidents at issue, more than 30 days have elapsed since such filing and the City of New York has refused to settle

plaintiffs' claims.  Moreover, this action has been filed within one year and 90 days of the incidents that are the basis of this claim.  Plaintiffs have satisfied all conditions precedent for the filing of this action, and remain available for a 50-H hearing.

4.    Venue is proper here pursuant to 28 U.S.C. § 1391 because some of the acts in question occurred in Queens County, and the City of New York is subject to personal jurisdiction in the Eastern District of New York.

**PARTIES**

5.    Plaintiff Shawn Gilliam, Sr. is an African American male resident of the State of New York, Queens County.

6.    Plaintiff Shawn Gilliam, Jr. is an African American male resident of the State of New York, Queens County.

7.    At all times alleged herein, defendant City of New York was a municipal corporation organized under the laws of the State of New York, which violated plaintiffs' rights as described herein.

8.    At all times alleged herein, defendants Sgt. William Larkin, Tax # 930534; P.O. Elisha Thomas, Tax # 937623, P.O. Tawaina O'Neal-Davis, Tax # 906979; P.O. Christopher Brooks, Shield # 30086, Tax # 934534; P.O. Roland Matthews, Tax # 937048; P.O. Oleg Matat, Tax # 937042; P.O. Peter DeVita, Tax

3

# 934753; and P.O. John Does # 1-5 were New York City Police Officers employed with the PSA # 9, and/or 114th Precinct, located in Queens County, New York or other as yet unknown NYPD assignment, who violated plaintiffs' rights as described herein.

9. The individual defendants are sued in their individual and official capacities.

## STATEMENT OF FACTS

**April 8, 2011 Arrest**

10. On April 8, 2011, at and in the vicinity of Broadway and 21st Street, Long Island City, New York, and the 114th Precinct, Queens, New York, several police officers operating from the 114th Precinct, Queens, New York, including upon information and belief, defendants P.O. Thomas and P.O. O'Neal-Davis, at times acting in concert, and at times acting independently, committed the following illegal acts against the plaintiff.

11. On April 8, 2011, at approximately 9:30 a.m. to 10:00 a.m., at and in the vicinity of Broadway and 21st Street, Long Island City, New York, defendants P.O. Thomas and P.O. O'Neal-Davis, without either consent, an arrest warrant, a lawful search warrant, probable cause, or reasonable suspicion that plaintiff (or any third person) had committed a crime falsely arrested the plaintiff Shawn Gilliam, Jr.

4

12.   Shawn Gilliam, Jr. had left a bus and was with his friends when without cause, justification or reasonable suspicion P.O. Thomas and P.O. O'Neal-Davis approached and stopped them.

13.   Once the defendant officers confronted Shawn Gilliam, Jr. and his friends, they were not free to disregard the defendant officers' questions, walk away or leave the scene.

14.   The defendant officers demand that Shawn Gilliam, Jr. and his friends produce identification.  They also told Shawn Gilliam, Jr. to come with them to their police car, which he did.

15.   Shawn Gilliam, Jr. asked the defendant officers why they were detaining him and tried to explain where they were all headed, and that they had not done anything wrong.

16.   The defendant officers appeared not to like Shawn Gilliam, Jr.'s questioning and protestations, and without cause or provocation, P.O. Thomas and P.O. O'Neal-Davis suddenly grabbed Shawn Gilliam, Jr. by his arms and twisted them behind his back.  They also kneed him in the back, and placed excessively tight handcuffs on his wrists.

17.   After Shawn Gilliam, Jr. was handcuffed, P.O. Thomas and P.O. O'Neal-Davis continued to hit him, kneeing him in the back and kicking him in the face.  The defendant officers

also tore his jacket, pushed his head into the ground, and dragged him on the ground.

18.   When the defendant officers were done assaulting Shawn Gilliam, Jr., P.O. Thomas called him an explicative, and when Shawn Gilliam, Jr. complained, P.O. O'Neal-Davis smashed his head against a car while still handcuffed.

19.   The plaintiff was physically injured as a result the use of force, including pain, bruises and abrasions, and received medical treatment for his injuries.

20.   The defendant officers then put Shawn Gilliam, Jr. in a police car and drove him to the 114th Precinct where they processed his arrest.

21.   After remaining at the 114th Precinct for many hours, Shawn Gilliam, Jr. was transported to Central Booking for arraignment, where he was released on his own recognizance.

22.   In order to cover up their illegal actions, the defendant officers, pursuant to a conspiracy, initiated, and falsely and maliciously told the Queens County District Attorney's Office that the plaintiff had committed various crimes, including assault in the second degree.

23.   The defendant officers made these false allegations, despite the fact that they had no evidence that plaintiff had committed a crime, to cover up their misconduct,

6

to retaliate against the plaintiff, to meet productivity goals and quotas, and to justify overtime expenditures.

24.    Upon information and belief, the unlawful actions against the plaintiff were also based on profiling.

25.    Thereafter, the charges against the plaintiff were dismissed in contemplation of dismissal, terminating his favor.

**June 7, 2011 Arrest**

26.    On June 7, 2011, at and in the vicinity of 21st Street and 38th Avenue, Long Island City New York, and the 114th Precinct, Queens, New York, several police officers operating from the 114th Precinct, Queens, New York, including upon information and belief, defendants Sgt. Larkin, P.O. Brooks, P.O. Matthews, P.O. Matat, P.O. DeVita, and P.O. John Does # 1-5, at times acting in concert, and at times acting independently, committed the following illegal acts against the plaintiffs Shawn Gilliam, Sr. and Shawn Gilliam, Jr.

27.    On June 7, 2011, at approximately 1:00 p.m. to 1:30 p.m., at and in the vicinity of 21st Street and 38th Avenue, Long Island City New York, defendants Sgt. Larkin, P.O. Brooks, P.O. Matthews, P.O. Matat, P.O. DeVita, and P.O. John Does # 1-5, without either consent, an arrest warrant, a lawful search warrant, probable cause, or reasonable suspicion that plaintiffs

7

(or any third person) had committed a crime falsely arrested the plaintiffs Shawn Gilliam, Sr. and Shawn Gilliam, Jr.

28.   Shawn Gilliam, Sr. was driving his car with his son Shawn Gilliam, Jr. and his son's friends as passengers when defendants P.O. Matthews and P.O. Matat pulled over the car without cause or justification.

29.   P.O. Matthews and P.O. Matat were driving an unmarked police van.

30.   Shawn Gilliam, Sr. had not violated any traffic laws, and the car was fully registered and in proper condition.

31.   The defendant officers ordered Shawn Gilliam, Sr. to produce his license, insurance and registration, which he did.

32.   The defendant officers then ordered the plaintiffs and Shawn Gilliam, Jr.'s friend to get out of the car to be searched, which they did.

33.   Once confronted, the plaintiffs were not free to disregard the defendant officers' questions, walk away or leave the scene.

34.   As soon as the plaintiffs left their car, one of the defendants grabbed Shawn Jr. without cause or justification and wrenched one of his arms behind his back, after the

plaintiffs complained that the defendant officers had unlawfully stopped them and were abusing their authority.

35.    Shawn Jr. asked why he was being arrested and told the defendant officers that he had not done anything wrong. This appeared to anger the defendant officers more, and they threw Shawn Jr. on the ground, put their knees in his back, and placed excessively tight handcuffs on his wrists.  After Shawn Jr. was handcuffed, one officer punched him in the face.

36.    Shawn Gilliam, Sr. saw what the defendant officers were doing to his son and told them to stop hurting him, but they would not stop.

37.    P.O. Matthews held Shawn Sr. against his car with his baton while his son was being assaulted.

38.    Shawn Sr. continued to tell the officers to stop their attack.  This angered the defendant officers who, without provocation or cause, then attacked Shawn Sr., striking him in the torso, head, and face, before bringing him to the ground and handcuffing him.

39.    While on the ground the defendant officers continued to hit Shawn Sr., before eventually leaving him on a nearby sidewalk in handcuffs.

40.    At least one defendant officer struck Shawn Sr. with an asp during the attack.

41.   Sgt. Larkin, P.O. Brooks, P.O. DeVita, and P.O. John Does # 1-5 arrived while Shawn Sr. was on the ground.

42.   P.O. Brooks said that's the one I want, called Shawn Sr. a motherfucker, and stepped on one of Shawn Sr.'s wrists intentionally pressing the handcuff into his wrist.

43.   The defendant officers took Shawn Jr. to an awaiting police van, and when Shawn Jr. kept asking for medical treatment P.O. Matthews grabbed and threatened him.

44.   Eventually, an ambulance came and took Shawn Sr. to the hospital for medical treatment where his injuries were treated.

45.   The plaintiffs were physically injured as a result the use of force, including pain, bruises and abrasions.

46.   Shawn Jr. received medical treatment for his injuries after his release from custody.

47.   Both plaintiffs were eventually transported to the 114th Precinct, where their arrests were processed before being transported to Central Booking for arraignment they were arraigned and released on their own recognizance.

48.   In order to cover up their illegal actions, the defendant officers, pursuant to a conspiracy, initiated, and falsely and maliciously told the Queens County District

Attorney's Office that the plaintiffs had committed various crimes, including assault in the second degree.

49.   The defendant officers made these false allegations, despite the fact that they had no evidence that plaintiffs had committed a crime, to cover up their misconduct, to retaliate against the plaintiffs, to meet productivity goals and quotas, and to justify overtime expenditures.

50.   Upon information and belief, the unlawful actions against the plaintiffs were also based on profiling.

51.   Thereafter, the charges against the plaintiffs were dismissed in contemplation of dismissal, terminating their favor.

## General Allegations

52.   The individual defendants acted in concert in committing the above-described illegal acts against the plaintiffs.

53.   The plaintiffs did not resist arrest at any time during the above-described incidents.

54.   The plaintiffs did not violate any law, regulation, or administrative code; commit any criminal act; or act in a suspicious or unlawful manner prior to or during the above-described incident.

55.   The individual defendants did not observe the plaintiffs violate any law, regulation, or administrative code; commit any criminal act; or act in a suspicious or unlawful manner prior to or during the above-described incident.

56.   The individual defendants acted under pretense and color of state law and their individual and official capacities and within the scope of their employment.  Said acts by said defendants were beyond the scope of their jurisdiction, without authority or law, and in abuse of their powers, and said defendants acted willfully, knowingly, and with the specific intent to deprive plaintiffs of their rights.

57.   Defendant City of New York through the NYPD and its officers, committed the following unconstitutional practices against the plaintiffs: (1) fabricating evidence against innocent persons; (2) unlawfully stopping and searching persons; (3) wrongfully arresting individuals based on pretexts and profiling; (4) using excessive force on individuals; and (5) arresting innocent persons in order to meet productivity goals, justify overtime, and over up waste.

58.   The existence of the aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct involving the individual defendants, placing the defendant City of New York on notice of the

individual defendants' propensity to violate the rights of individuals.

59.   Additionally, the existence of the aforesaid unconstitutional customs and polices of profiling minorities, may be inferred from an analysis of the NYPD conducted by the New York Civil Liberties Union ("NYCLU").  The NYCLU's analysis revealed that more than 2 million innocent New Yorkers were subjected to police stops and street interrogations from 2004 through 2010, and that black and Latino communities continue to be the overwhelming target of these tactics.  Nearly nine out of 10 stopped-and-frisked New Yorkers have been completely innocent, according to the NYPD's own reports:

60.   In 2004, 315,483 New Yorkers were stopped by the police: 279,754 were totally innocent (89 percent); 156,056 were black (50 percent); 90,468 were Latino (29 percent); and 29,000 were white (9 percent).

61.   In 2005, 399,043 New Yorkers were stopped by the police: 351,842 were totally innocent (88 percent); 196,977 were black (49 percent); 115,395 were Latino (29 percent); and 40,837 were white (10 percent).

62.   In 2006, 508,540 New Yorkers were stopped by the police: 458,104 were totally innocent (90 percent); 268,610 were

black (53 percent); 148,364 were Latino (29 percent); and 53,793 were white (11 percent).

      63.   In 2007, 468,732 New Yorkers were stopped by the police: 407,923 were totally innocent (87 percent); 242,373 were black (52 percent); 142,903 were Latino (31 percent); and 52,715 were white (11 percent).

      64.   In 2008, 531,159 New Yorkers were stopped by the police: 465,413 were totally innocent (88 percent); 271,602 were black (51 percent); 167,111 were Latino (32 percent); and 57,407 were white (11 percent).

      65.   In 2009, 575,304 New Yorkers were stopped by the police: 504,594 were totally innocent (88 percent); 308,941 were black (54 percent); 179,576 were Latino (31 percent); and 53,466 were white (9 percent).

      66.   In 2010, 601,055 New Yorkers were stopped by the police: 517,458 were totally innocent (86 percent); 317,642 were black (53 percent); 190,491 were Latino (32 percent); and 55,083 were white (9 percent).

      67.   In 2011, 685,724, New Yorkers were stopped by the police: 605,328 were totally innocent (88 percent); 350,743 were black (53 percent); 223,740 were Latino (34 percent); and 61,805 55,083 were white (9 percent).

68.    In addition, research by Harry G. Levine, a professor of sociology at Brooklyn College, City University of New York (who is the coauthor of Crack in America: Demon Drugs and Social Justice, and of the NYCLU report: Marijuana Arrest Crusade: Racial Bias and Police Policy in New York City, 1997-2007) also shows City of New York's unconstitutional customs and polices against minorities.

69.    In August 2009, Proffer Levine released a report entitled *The Epidemic of Pot Arrests in New York City*, which stated: Perhaps most appalling is who the police are arresting for marijuana possession.  United States government studies have consistently found that young whites use marijuana at higher rates than do young blacks or Latinos. But the NYPD has long arrested young blacks and Latinos for pot possession at much higher rates than whites. In 2008, blacks were about 26% of New York City's population, but over 54% of the people arrested for pot possession. Latinos were about 27% of New Yorkers, but 33% of the pot arrestees. Whites were over 35% of the City's population, but less than 10% of the people arrested for possessing marijuana. In 2008, police arrested Latinos for pot possession at four times the rate of whites, and blacks at seven times the rate of whites.

70.   Furthermore, documented civilian complaints about officer misconduct show that African Americans are the most likely targets of abuse, but their complaints are largely ignored.  According to the City of New York's Civil Complaint Review Board's ("CCRB") Status Report, dated December and January 2010, in 2010 African Americans were overrepresented as alleged victims of police misconduct.  Although making up only 23% of New York City's population, they are 58.5% of the alleged victims in CCRB complaints.  On the other hand, whites and Asians were a disproportionately low percentage of alleged victims.

71.   The report continued: In 2010, 12% of alleged victims were white, and 2% were Asian, though they make up 34% and 13% of New York City's population, respectively.  The percentage of Latino victims was comparable to the population. Latinos were 25% of alleged victims in CCRB complaints and 29% of the population.  These numbers have remained fairly consistent over the last five years, with between 56% and 58% of all alleged victims being African-American.  Latinos have consistently made up between 23% and 26% of alleged victims, and Whites between 12% and 14%. Asians have never made up less than 2% or more than 3% of all alleged victims. Each year, approximately 3% of alleged victims are classified as "other."

16

72.    However, the vast majority of these complaints are ignored by the City of New York and the NYPD.  According to the NYCLU, the CCRB is failing to fulfill its mission as mandated in the City Charter.  The New York City Charter mandates that the CCRB undertake "complete, thorough and impartial" investigations of police-misconduct complaints brought by civilians, and that these investigations are conducted in a manner in which both the public and the police have confidence.  The CCRB fails to meet this standard.  The agency investigates fewer than half of all complaints that it reviews, and it produces a finding on the merits in only three of ten complaints disposed of in any given year.  The agency has failed to win the confidence of the city's residents; the police department is largely dismissive of CCRB findings and recommendations.

73.    The report continued:  The CCRB has been unable to establish an effective investigative operation.  The CCRB has historically closed about 50 percent of police-misconduct complaints without initiating an investigation; between 2002 and 2005 the "truncation" rate increased to 55 percent.  In 2006 the CCRB closed 60 percent of all complaints without undertaking an investigation.  The CCRB has conducted a full investigation in fewer than half of the complaints it has reviewed and disposed

17

of.  In 2002-2005 the CCRB closed only 42 percent of complaints
with a full investigation.   Of complaints fully investigated by
the CCRB, the agency has disposed of approximately one-third as
unsubstantiated -- or inconclusive.  The CCRB has substantiated,
on average, 5.2 percent of complaints closed -- far below the
substantiation rates reported by civilian oversight agencies
nationally.

74.   The report further stated: The CCRB has failed to
advocate effectively for reform of police practices that pose a
risk to public safety.  The CCRB has done little to identify
patterns of police misconduct and to recommend reforms in police
practices that pose an undue risk of harm to civilians.  The
CCRB has failed to address effectively patterns of police
misconduct related to racial profiling, the execution of "no-
knock" warrants, and the policing of lawful public
demonstrations.  Even when the CCRB has documented a pattern of
misconduct, and recommended reforms, the agency has often been
silent when the department failed to act on the recommendations.

75.   Moreover, according to the research done by the
NYCLU, the NYPD condones acts of police misconduct by nullifying
CCRB findings and recommendations.   The department takes no
disciplinary action against almost 30 percent of police officers
named in substantiated CCRB complaints.  Between 2000 and 2005

18

the NYPD disposed of substantiated complaints against 2,462
police officers: 725 received no discipline. When discipline was
imposed, it was little more than a slap on the wrist.  Of the
1,607 police officers who were disciplined in this time period,
534 received instructions regarding the misconduct.  Another 717
police officers received command discipline -- which at the
discretion of the precinct commander may involve nothing more
than a verbal admonishment. The most severe sanction imposed
under command discipline is a loss of 10 vacation days.  In
recent years it appears that the NYPD has adopted a radically
more lenient disciplinary standard as regards acts of police
misconduct directed at civilians.  In 2004 the police department
ordered instructions in approximately 30 percent of all
disciplinary actions related to a substantiated CCRB complaint.
In 2005 instructions represented nearly 60 percent of such
disciplinary actions; and in 2006 instructions rose to 72
percent of all disciplinary actions related to police misconduct
directed at civilians. Suspension of a police officer has become
an extraordinarily rare occurrence, even when egregious acts of
misconduct are involved.

        76.   Finally, of the 1,076 police officers who were
referred to an administrative trial to face charges between 1998
and 2004, approximately 63 percent received no discipline. (2004

19

is the last year for which complete data are available on disciplinary action taken by the NYPD, based on the year CCRB complaints were referred for discipline.)  In most of those cases, the administrative trial judge dismissed the charges or found the police officer not guilty.  During this time period, cases were dismissed against 198 police officers against whom the CCRB had substantiated misconduct complaints. In another 363 cases administrative judges issued non-guilty findings.

77.    Indeed, at one federal district court has noticed this persistent pattern of abuse and failure to monitor police misconduct.  In *Colon v. The City of New York,* 09-cv-8, 09-CV-9-JBW, 2009 WL 4263362 (E.D.N.Y. November 25, 2009), the federal court stated that an "[in]formal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the NYPD."

78.    The existence of the aforesaid unconstitutional customs and polices can also be inferred from the admission by Deputy Commissioner Paul J. Browne, as reported in the media on January 20, 2006, that commanders are permitted to set "productivity goals".

79.   These productivity quotas drive officers, such as the individual defendants in this case, to behave in an "overzealous" and unlawful manner to satisfy these goals.

80.   As reported in an October 13, 2011 New York Times article, entitled *The Drugs? They Came From the Police*, Steve Anderson, a former undercover police officer, testified at a criminal trial against a former fellow officer that "various narcotics" were kept and used by undercover officers to frame people for phantom drug sales.

81.   In two days on the witness stand at a trial of another officer in State Supreme Court in Brooklyn, Mr. Anderson, who worked in elite units in Brooklyn and Brooklyn, described how rules were trimmed, broken or ignored so that narcotics officers could make their monthly quotas of arrests or buys.

82.   His testimony fundamentally recast a scandal that became public three years ago, when officers in Brooklyn were caught not vouchering all the drugs they seized as evidence.  At the time, the authorities said the officers were using the surplus as rewards for information, with one law enforcement official describing it as "noble cause corruption."

83.   Mr. Anderson, however, testified that those spare drugs had other purposes: to plant on people when a narcotics officer needed a productivity boost.

84.   As a result of investigations into the drug units, prosecutors in Brooklyn and Brooklyn have dismissed about 400 criminal cases that they believe were tainted by the involvement of officers connected to the scandal.

85.   Mr. Anderson testified in the trial of Jason Arbeedy, who worked in Brooklyn and is accused of planting drugs on two people who had never been arrested.  Although he testified that he did not know Mr. Arbeedy or have any knowledge of wrongdoing by him, Mr. Anderson's description of the narcotics units was offered by prosecutors as evidence of what they say is a conspiracy to cover up its lawlessness by routinely falsifying records and keeping stashes of narcotics.

86.   Justice Gustin Reichbach, who heard the case without a jury, said he understood why Mr. Anderson would swap an arrest to help a fellow officer who was falling short of his targets, but pressed him on what he had done to innocent people.

87.   "What was your thought in terms of saving his career at the cost of these four people who had seemingly no involvement in the transaction?" Justice Reichbach asked.

88.   It was called "attaching bodies" to the drugs, Mr. Anderson answered, and he said nearly four years into his life undercover, he had become numb to the corruption.

89.   "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators," Mr. Anderson said. "Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach the bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway."

90.   "That kind of came on to me and I accepted it — being around that so long, and being an undercover."

91.   Indeed, the undue and illegal pressure to make arrests, regardless of their validity or value remains high throughout the NYPD.  This policy, practice and custom is in contravention of the true purpose of the law, which is to protect its citizens and not persecute them.

92.   Indeed, as reported in the Daily News on February 23, 2012 in an article entitled: *Cop Claims Bronx Precinct Ruled By Illegal System Of Zealous Arrest Quotas Color-Coded Reports Track Officer Performance: Lawsuit*, a NYPD officer has sued, charging the 42nd Precinct is run under a zealous quota system.

93.   As reported, a veteran NYPD police officer claims his Bronx precinct is ruled by an elaborate quota system that

23

has created so much tension that police officers now guard the locker room.

94.    In a federal lawsuit, Officer Craig Matthews charges the illegal quotas in place at the 42nd precinct have led to harsh punishments and pitted police officers against each other.

95.    Central to the quota system are color-coded computer reports that categorize police officers by the number of arrests, summonses and stop-and-frisks they carry out.

96.    Officers who fail to meet the reports are highlighted in red.

97.    Black ink is used to denote police officers who are meeting the quotas, while silver is used to identify those who are meeting some quotas, the suit says.

98.    Matthews claims that officers who do not hit their numbers are subjected to a slew of punishments, including undesirable assignments and the loss of overtime.

99.    "Cops are pressured to make numbers and are punished for not making them, which means that innocent people are exposed to baseless summonses, arrests, and stop-and-frisks," said Matthews' lawyer, Christopher Dunn.

100.    Matthews' claims echo those of police officers who have come forward in the last three years to reveal the

24

department's habit of illegally setting quotas and punishing police officers who do not meet them.

101.  A 14-year veteran of the force, Matthews says he was immediately irked by the quota system put in place in 2008. He says he complained about the system several times to his precinct's commanding officer.  He also brought his concerns to a Deputy Inspector.

102.  But the system continued unabated - and Matthews soon was the target of a campaign of retaliation, the suit says. Matthews says he was humiliated by his supervisors in front of other police officers and assigned especially dangerous duties, such as transporting several prisoners without the standard number of back-up officers.  Matthews, who has received more than 20 awards for his police work, also started receiving poor evaluations.  "If you come after me, I will come back after you harder," a supervisor said, according to the suit.

103.  As reported in the article, it is not the first time the 42nd Precinct has been hit by the quota controversy. Last May, Officer Vanessa Hicks sued the NYPD, claiming she was transferred because she did not conduct enough stop-and-frisks. In February 2010, a precinct union delegate, Officer Frank Palestro, was transferred after he reported corruption to Internal Affairs, alleging that a female lieutenant ordered

police officers to write summonses for traffic violations they did not witness, refused to take crime complaints and tampered with a gun at a crime scene.

104.   The foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the NYPD constituted a deliberate indifference to the safety, well-being and constitutional rights of plaintiffs.

105.   The foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the NYPD were the direct and proximate cause of the constitutional violations suffered by the plaintiffs as alleged herein.

106.   The foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the NYPD were the moving force behind the constitutional violations suffered by the plaintiffs as alleged herein.

107.   As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the NYPD, the plaintiffs was unlawfully detained and searched, falsely arrested, subjected to excessive force, retaliation, malicious prosecution, denial of a fair trial, and fabricated evidence.

108.   As a direct and proximate result of the defendants' actions plaintiffs experienced personal and physical

injuries, pain and suffering, fear, an invasion of privacy, psychological pain, emotional distress, mental anguish, embarrassment, humiliation, and financial loss.

109.  Plaintiffs are entitled to receive punitive damages from the individual defendants because the individual defendants' actions were motivated by extreme recklessness and indifference to plaintiffs' rights.

### FIRST CLAIM

**(UNLAWFUL SEARCH AND SEIZURE UNDER FEDERAL LAW)**

110.  Plaintiffs repeat and reallege all the foregoing paragraphs as if the same were fully set forth at length herein.

111.  Defendants unlawfully stopped and searched plaintiffs without a warrant, or consent.

112.  Accordingly, defendants are liable to plaintiffs for unlawful search and seizure under 42 U.S.C. § 1983; and the Fourth and Fifth Amendments to the United States Constitution.

### SECOND CLAIM

**(UNLAWFUL SEARCH AND SEIZURE UNDER STATE LAW)**

113.  Plaintiffs repeat and reallege all the foregoing paragraphs as if the same were fully set forth at length herein.

114.  Defendants unlawfully stopped and searched plaintiffs without a warrant, or consent.

115.   Accordingly, defendants are liable to plaintiffs for unlawful search and seizure under New York State law.

### THIRD CLAIM

#### (FALSE ARREST UNDER FEDERAL LAW)

116.   Plaintiff repeat and reallege all the foregoing paragraphs as if the same were fully set forth at length herein

117.   Defendants falsely arrested plaintiffs without consent, an arrest warrant, a lawful search warrant, probable cause, or reasonable suspicion that plaintiffs had committed a crime.

118.   Accordingly, defendants are liable to plaintiffs for false arrest under 42 U.S.C. § 1983; and the Fourth and Fifth Amendments to the United States Constitution.

### FOURTH CLAIM

#### (FALSE ARREST UNDER STATE LAW)

119.   Plaintiffs repeat and reallege all the foregoing paragraphs as if the same were fully set forth at length herein.

120.   Defendants falsely arrested plaintiffs without consent, an arrest warrant, a lawful search warrant, probable cause, or reasonable suspicion that plaintiffs had committed a crime.

121.   Accordingly, defendants are liable to plaintiffs for false arrest under New York State law.

28

## FIFTH CLAIM

### (EXCESSIVE FORCE)

122.   Plaintiffs repeat and reallege all the foregoing paragraphs as if the same were fully set forth at length herein.

123.   The individual defendants' use of force upon plaintiffs was objectively unreasonable.

124.   The individual defendant officers did not have an objective and/or reasonable basis to use any degree of force against plaintiffs, since plaintiffs were unarmed, compliant, and did not resist arrest.

125.   Those defendants who did not touch the plaintiffs, witnessed these acts, but failed to intervene and protect plaintiffs from this conduct.

126.   Accordingly, the defendants are liable to plaintiffs for using unreasonable and excessive force, pursuant to 42 U.S.C. § 1983; and the Fourth and Fifth Amendments to the United States Constitution.

## SIXTH CLAIM

### (ASSAULT)

127.   Plaintiffs repeat and reallege all the foregoing paragraphs as if the same were fully set forth at length herein.

128.   Among other things as described above, defendants' search and seizure, battery, false arrest, and

29

excessive use of force against plaintiffs placed him in fear of imminent harmful and offensive physical contacts.

129.   Accordingly, defendants are liable to plaintiffs under New York State law for assault.

### SEVENTH CLAIM

#### (BATTERY)

130.   Plaintiffs repeat and reallege all the foregoing paragraphs as if the same were fully set forth at length herein.

131.   Among other things as described above, defendants' search and seizure, false arrest, and excessive use of force against plaintiffs were illegal physical contacts.

132.   Accordingly, defendants are liable to plaintiffs under New York State law for battery.

### EIGHTH CLAIM

#### (RETALIATION)

133.   Plaintiffs repeat and reallege all the foregoing paragraphs as if the same were fully set forth at length herein.

134.   Plaintiffs exercised free speech during the incident by, among other things, complaining about the individual defendants' unlawful acts.

135.   Plaintiffs' use of free speech was a motivating factor in the individual defendants' decision to falsely arrest them.

136.   Accordingly, the individual defendants are liable to plaintiffs under the First Amendment to the United States Constitution.

## NINTH CLAIM

### (FABRICATED EVIDENCE)

137.   Plaintiffs repeat and reallege all the foregoing paragraphs as if the same were fully set forth at length herein.

138.   The defendants are liable to plaintiffs because they intentionally conspired to fabricate evidence against the plaintiffs, depriving the plaintiffs of liberty without due process of law.

139.   In addition, the defendants used and presented the fabricated evidence to prosecute the plaintiffs.

140.   Further, the defendants were on notice that creating fabricated evidence is a clear violation of law because it well established that police officer who knowingly use false evidence to obtain a conviction act unconstitutionally.

141.   Furthermore, the defendants violated the law by making false statements of fact in a certification for determination of probable cause and/or a conviction, because they performed a function of a complaining witness.

## TENTH CLAIM

### (DENAIL OF A FAIR TRIAL)

31

142.   Plaintiffs repeat and reallege all the foregoing paragraphs as if the same were fully set forth at length herein.

143.   The individual defendants are liable to the plaintiffs because they intentionally created false information likely to influence a fact finder's or jury's decision and forwarded that information to prosecutors, a grand jury, and/or court, thereby violating plaintiffs' constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983.

## ELEVENTH CLAIM

### (NEGLIGENT SUPERVISION, HIRING, MONITORING TRAINING AND RETENTION OF UNFIT EMPLOYEE)

144.   Plaintiff repeat and reallege all the foregoing paragraphs as if the same were fully set forth at length herein.

145.   Defendant City of New York is liable to the plaintiff because the occurrence and injuries sustained by plaintiff, were caused solely by, and as a result of the malicious, reckless, negligent, and/or intentional conduct of defendant City of New York, and the NYPD, its agents, servants and/or employees, as set forth above, without provocation on the part of plaintiff contributing thereto, specifically, the negligent and reckless manner in which said defendant hired,

trained, supervised, controlled, managed, maintained, inspected and retained its police officers.

## TWELFTH CLAIM

### (INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)

146.   Plaintiff repeat and reallege all the foregoing paragraphs as if the same were fully set forth at length herein.

147.   That by virtue of the occurrence and defendants, individually and/or by their agents, servants and/or employees, negligently and/or intentionally inflicted emotional harm upon plaintiff.

148.   The defendants' actions against plaintiff were extreme and outrageous and caused plaintiff severe emotional distress.

149.   The defendants breached a duty owed to the plaintiff that either unreasonably endangered plaintiff' physical safety, or caused the plaintiff to fear for their own safety.

## THIRTEENTH CLAIM

### (NEGLIGENCE)

150.   Plaintiff repeat and reallege all the foregoing paragraphs as if the same were fully set forth at length herein.

151.   Defendants are liable to plaintiff because defendants owed plaintiff a cognizable duty of care as a matter of law, and breached that duty.

## FOURTEENTH CLAIM

### (42 U.S.C. § 1983 VIOLATION OF EQUAL PROTECTION CLAUSE)

152.   Plaintiffs repeat and reallege all the foregoing paragraphs as if the same were fully set forth at length herein.

153.   Defendants City of New York has implemented and are continuing to enforce, encourage and sanction a policy, practice and/or custom of unconstitutional stop and frisks, arrests, and malicious prosecutions of City residents, including plaintiffs, based solely on race and/or national origin.  These suspicionless stop and frisks, arrests and prosecutions by NYPD officers have and are being conducted predominantly on Black and Latino individuals, on the basis of racial and/or national origin profiling.  As a result, the NYPD's policy, practice and/or custom of suspicionless stop and frisks, arrests and prosecutions by NYPD officers violate the Equal Protection Clause of the Fourteenth Amendment.  The NYPD's constitutional abuses were and are directly and proximately caused by policies, practices and/or customs devised, implemented and enforced by the City of New York, including: (a) the failure to properly screen, train and supervise NYPD officers, (b) the failure to

34

adequately monitor NYPD officers and their stop and frisk, arrest and prosecution practices, (c) the failure to sufficiently discipline NYPD officers who engage in constitutional abuses, and (d) the overt and tacit encouragement and sanctioning of, and the failure to rectify the NYPD's unconstitutional practices.

154.   Each of the defendants has acted with deliberate indifference to the Fourth Amendment rights of plaintiffs.  As a direct and proximate result of the acts and omissions of each of the defendants, the plaintiffs' rights have been violated.  By acting under color of state law to deprive plaintiffs of their rights under the Fourth Amendment, the defendants are in violation of 42 U.S.C. § 1983, which prohibits the deprivation under color of state law of rights secured under the United States Constitution.

**FIFTHTEENTH CLAIM**

**(DELIBERATE INDIFFERENCE)**

155.   Plaintiffs repeat and reallege all the foregoing paragraphs as if the same were fully set forth at length herein.

156.   The City of New York has acted with deliberate indifference to the constitutional rights of those who would come into contact with and who are prosecuted by NYPD officers by: (a) failing to properly screen, train and supervise NYPD

35

officers, (b) inadequately monitoring NYPD officers and their stop and frisk, arrest and prosecution practices, (c) failing to sufficiently discipline NYPD officers who engage in constitutional abuses, and (d) encouraging, sanctioning and failing to rectify the NYPD's unconstitutional practices.

157.  As a direct and proximate result of the aforesaid acts and omissions, the defendants have deprived the plaintiffs of their Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983.

158.  The acts and omissions of the defendants explained herein were intentional, wanton, malicious, reckless and oppressive, thus, entitling the plaintiffs to an award of punitive damages.  In engaging in such conduct, the defendants acted beyond the scope of their jurisdiction, without authority under law, and in abuse of their powers.

## SIXTHTEENTH CLAIM

### (MONELL CLAIM)

159.  Plaintiffs repeat and reallege all the foregoing paragraphs as if the same were fully set forth at length herein.

160.  Defendant City of New York, through a policy, practice and custom, directly caused the constitutional violations suffered by the plaintiff.

161.  Upon information and belief, defendant City of New York, at all relevant times, was aware that the defendants are unfit officers who have previously committed the acts alleged herein, have a propensity for unconstitutional conduct, or have been inadequately trained.

162.  Nevertheless, defendant City of New York exercised deliberate indifference by failing to take remedial action.  The City failed to properly train, retrain, supervise, discipline, and monitor the individual defendants and improperly retained and utilized them.  Moreover, upon information and belief, defendant City of New York failed to adequately investigate prior complaints filed against the individual defendants.

163.  Further, defendant City of New York was aware prior to the incident that the individual defendants (in continuation of its illegal customs, practices and/or policies) would unlawfully arrest individuals.

### SEVENTEENTH CLAIM

#### (RESPONDEAT SUPERIOR)

164.  Plaintiffs repeat and reallege all the foregoing paragraphs as if the same were fully set forth at length herein.

165.  The individual defendants were acting within the scope of their employment as New York City Police Officers when

37

they committed the above described acts against the plaintiff,
including falsely arresting, assaulting, and battering the
plaintiff.

      166.  The City of New York is therefore vicariously
liable under New York State law for the aforesaid torts.

      **WHEREFORE,** plaintiffs demand a jury trial and the
following relief jointly and severally against the defendants:

      a.    Compensatory damages in an amount to be
determined by a jury;

      b.    Punitive damages in an amount to be determined by
a jury;

      c.    Costs, interest and attorney's fees, pursuant to
42 U.S.C. § 1988; and

      d.    Such other and further relief as this Court may
deem just and proper, including injunctive and
declaratory relief.

DATED:    Brooklyn, New York
            May 23, 2013

                                   MICHAEL O. HUESTON, ESQ.
                                   *Attorney for Plaintiffs*
                                   16 Court Street, Suite 3301
                                   Brooklyn, New York 11241
                                   (718) 246-2900
                                   mhueston@nyc.rr.com
                                   By:

                                   ___s/_____
                                   MICHAEL O. HUESTON